[No. 19528-3-II. Division Two. August 15, 1997.]

STEVEN RAY KELLY-HANSEN, *Respondent*, v.
KIMBERLY CLAIRE KELLY-HANSEN, *Appellant*.

---

[27]*State v. Guloy*, 104 Wn.2d 412, 425, 705 P.2d 1182 (1985).

*Margaret K. Dore,* for appellant.

322

*Charles K. Wiggins;* and *Keith A. Beebe,* for respondent.

MORGAN, J. — Kimberly Claire Kelly-Hansen (hereafter Kelly) and Steven Ray Kelly-Hansen (hereafter Hansen) formed two property-related separation agreements, in August 1988 and January 1989 respectively. Their marriage was dissolved on May 24, 1989. The decree, even though it purported to distribute all their property and debts, did not mention either agreement. Relying on the 1988 agreement, Kelly now claims that Hansen, after dissolution, owed her more than the amount stated in the decree. Relying on the 1989 agreement, Hansen now claims that he owed Kelly less than the amount stated in the decree. Holding that the decree is res judicata as to each party, we reverse and remand for further proceedings.

Kelly and Hansen were married on September 27, 1980. At the times material here, she was employed full-time, he was unemployed or employed part-time, and they had no children.

In the spring of 1986, Kelly and Hansen bought a parcel of land near Kingston, Kitsap County, Washington (hereafter, the Kingston property). They soon began building—but never finished—a house. He supplied the labor, and she supplied, from her earnings, the money needed for building materials. According to her, she furnished about $30,000 between the summer of 1986 and the end of 1988.

In September 1987, they separated when she began to reside in Seattle, and he continued to reside in Kitsap County. According to her, her purpose in leaving was "not

to get a divorce, but to get some space."[1] She "continued to see [Hansen] and contribute to his financial support." During this period of time, she "loaned him approximately $3,000.00 for a trailer and other miscellaneous expenses."[2]

In August 1988, Kelly and Hansen "met in [her] apartment in Seattle, to determine a settlement."[3] According to her, they orally agreed:

> that he would reimburse [her] for half of the cost of the building materials—whatever that number was. [They] also agreed that he would repay [her] for the loan for the trailer and miscellaneous expenses.[4]

At the time, they "were both aware that [she] had spent some $30,000 on [building] materials,"[5] but they lacked an exact number because he had failed to produce receipts. Hereafter, we refer to this transaction as the 1988 separation agreement, and we assume, without so holding, that its oral nature did not cause it to be unenforcable at its inception.[6]

On January 31, 1989, Kelly and Hansen agreed, accord-

---

[1]Clerk's Papers at 188.

[2]Clerk's Papers at 188.

[3]Clerk's Papers at 188.

[4]Clerk's Papers at 189.

[5]Clerk's Papers at 189.

[6]Thus, we do not reach the question whether an *oral* separation agreement is enforceable in light of RCW 26.09.070(1) and CR 2A, even though we asked the parties for supplemental briefing on those questions. RCW 26.09.070(1) provides in part:

> The parties to a marriage, in order to promote the amicable settlement of disputes attendant upon their separation or upon the filing of a petition for dissolution of their marriage . . . , may enter into a written separation contract providing for . . . the disposition of any property owned by both or either of them . . . .

CR 2A provides:

> No agreement or consent between parties or attorneys in respect to the proceedings in a cause, the purport of which is disputed, will be regarded by the court unless the same shall have been made and assented to in open court on the record, or entered in the minutes, or unless the evidence thereof shall be in writing and subscribed by the attorneys denying the same.

ing to Kelly, that she would receive $8,000 for her interest in the Kingston property. He was to remit the $8,000 before they divorced, by obtaining a bank loan and using the property as security. To memorialize this agreement, Kelly executed a quitclaim deed to Hansen, and he executed a promissory note and deed of trust to her. The promissory note required him to pay $8,000 at $200 per month, starting March 1, 1989, without interest. Hereafter, we refer to this transaction as the 1989 separation agreement.

On May 24, 1989, Kelly obtained a default decree of dissolution. She was present but Hansen was not, even though he had received proper notice. The decree purported to distribute all their property, both community and separate.[7] It awarded the Kingston property to Hansen; stated that Hansen owed Kelly a debt of $8,000, payable at $200 per month with interest of 12 percent per year; and secured Hansen's debt by giving Kelly a lien against the Kingston property. It did not mention either separation agreement, and it was not appealed.

Although Hansen never obtained a bank loan, he paid Kelly, before and after the decree, as follows:

| Date | Amount | |
|---|---|---|
| 08/18/88 | $ | 100.00 |
| 10/13/88 | $ | 100.00 |
| 11/14/88 | $ | 307.08 |
| 12/08/88 | $ | 500.00 |
| 12/29/88 | $ | 500.00 |
| 01/06/89 | $ | 500.00 |
| 01/25/89 | $ | 500.00 |
| 02/03/89 | $ | 500.00 |
| 04/19/89 | $ | 1,000.00 |

[7]The decree stated that "the separate and community assets of the parties shall be divided in accordance with Exhibit 'A'," and that "[a]ny assets not specifically identified in that Exhibit shall be deemed to be the asset of the party in whose name or possession such asset is currently held." Clerk's Papers at 31.

| Date | Amount |
|------|--------|
| 04/27/89 | $ 1,000.00 |
| 05/18/89 | $ 1,500.00 |
| 05/27/89 | $ 1,000.00 |
| 06/22/89 | $ 500.00 |
| 07/21/89 | $ 500.00 |
| 09/06/89 | $ 2,500.00 |
| Total | $ 11,007.08 |

More than five years passed. Then, on February 23, 1995, Hansen sued to cancel Kelly's lien. Relying on RCW 61.16.030,[8] he alleged that the decree of dissolution had ordered him to pay $8,000; that "[i]n satisfaction thereof" he had executed the promissory note and deed of trust; and that since then he had paid more than $8,000.[9] Thus, he said, he was entitled to cancel the lien.

On April 14, 1995, Hansen presented a motion for summary judgment. The parties agreed that the lien created by the deed of trust and the lien created by the decree of dissolution were intended to secure the same $8,000 obligation.[10] The problem was whether Hansen had paid that obligation.

Arguing that he had not, Kelly espoused two theories. Her first theory was that the 1988 separation agreement required Hansen to reimburse her for half the money she had spent on building materials (about $15,000), and for the money she had loaned for the trailer and living expen-

[8]RCW 61.16.030 states:

If the mortgagee fails to acknowledge satisfaction of the mortgage as provided in RCW 61.16.020 sixty days from the date of such request or demand, the mortgagee shall forfeit and pay to the mortgagor damages and a reasonable attorneys' fee, to be recovered in any court having competent jurisdiction, and said court, when convinced that said mortgage has been fully satisfied, shall issue an order in writing, directing the auditor to cancel said mortgage, and the auditor shall immediately record the order and cancel the mortgage as directed by the court, upon the margin of the page upon which the mortgage is recorded, making reference thereupon to the order of the court and to the page where the order is recorded.

[9]Clerk's Papers at 3.

[10]Report of Proceedings at 10-11, 15, 17.

ses (about $3,000). The 1989 agreement required Hansen to pay $8,000 for her interest in the Kingston property. Hansen owed *both* obligations, for a total of about $26,000, and she had applied all his payments, both pre-decree and post-decree, to the larger of the two.[11] Hence, he had not paid any part of the $8,000 obligation, and he was not entitled to cancel the lien.

Kelly's second theory was that even if Hansen owed *only* the secured obligation, he owed under the terms of the decree, as opposed to the terms of the promissory note and deed of trust. According to the terms of the decree, he owed $8,000 as of May 24, 1989, and he had, since then, paid only $4,500. Hence, he still owed at least $3,500, and again he was not entitled to cancel the lien.

Hansen's response was that he owed $8,000 as of January 1989, and that he had paid more than that amount between January and September. Thus, he said, he was entitled to cancel the lien.

The trial court granted Hansen's motion for summary judgment, ruling "that there is no genuine issue of material fact, [that] the $8,000 . . . was paid, and that this judgment was satisfied."[12] Kelly then filed this appeal.

I

Our task is to ascertain what Hansen owed, and compare it to what he paid. In essence, Kelly uses the 1988 separation agreement as a basis for contending that Hansen owed about $26,000, less his post-decree payments, with interest at 12 percent per year. In essence, Hansen uses the 1989 separation agreement as a basis for contending that he owed $8,000, less the total of his pre-decree and post-decree payments, without interest. Hansen expressly asserts that Kelly's position is barred by res judicata, and Kelly impliedly asserts, insofar as her second theory is

---

[11]See *Oakes Logging, Inc. v. Green Crow, Inc.*, 66 Wn. App. 598, 602, 832 P.2d 894 (1992).

[12]Report of Proceedings at 22.

concerned, that Hansen's position is barred by res judicata.[13]

■ ■ "Res judicata" is not a precise term.[14] As one commentator states:

At times the term "res judicata" is used in the cases and literature to refer to the entire subject of the preclusive effect of judgments, including the relitigation of claims and issues that were litigated, or might have been litigated, in a prior action. In other instances, the term refers only to limitations on the relitigation of a claim, or cause of action. When used in this sense, res judicata is usually further subdivided into "merger" and "bar." The principles of merger apply when the prior judgment was for the claimant; those of bar apply when the judgment was for the party defending the claim.

While res judicata refers only to preclusion of the same claim, the term "collateral estoppel" denotes the preclusive principles that apply when the subsequent suit involves a different claim but the same issue. . . .

Modernly, the principles of merger and bar have been encompassed within the term "claim preclusion." The principles of collateral estoppel have been encompassed within the term "issue preclusion." . . .[15]

As a second commentator states:

Former adjudication may be broken into two basic concepts, often called "res judicata" and "estoppel by judgment." . . . . As used presently, the two terms refer to two ways that a judgment may preclude a future action. Res judicata prevents a plaintiff from suing on a claim that already has been decided and also prevents a defendant from raising any new defense to defeat the enforcement of an earlier judgment.

---

[13]As noted earlier in the text, Kelly's second theory was that if Hansen owed *only* the $8,000 secured obligation, he owed according to the terms of the decree, and not according to the terms of the promissory note or deed of trust. This was, in essence, a claim that the 1989 separation agreement merged in the decree when the decree became final.

[14]*Winchell's Donuts v. Quintana*, 65 Wn. App. 525, 529, 828 P.2d 1166 (1992).

[15]Philip A. Trautman, *Claim and Issue Preclusion in Civil Litigation in Washington*, 60 WASH. L. REV. 805, 805 (1985).

Estoppel by judgment precludes relitigation of any issue, regardless of whether the second action is on the same claim as the first one, if that particular issue actually was contested and decided in the first action. . . .

Both res judicata and estoppel by judgment may be subdivided. Res judicata traditionally is divided into two closely related doctrines, "merger" and "bar." They differ only in that merger applies when a claimant has prevailed in the earlier action and bar applies when he has lost. When a claimant wins a judgment, all possible grounds for the cause of action are said to be merged into that judgment and are not available for further litigation. If a party loses the first suit, he is said to be barred by the adverse judgment from ever raising the same cause of action again, even if he can present new grounds for recovery. . . . Claim-splitting . . . is prohibited by both merger and bar.[16]

The Washington Supreme Court has used res judicata to mean both claim preclusion and issue preclusion, saying, for example, that "[r]es judicata refers to 'the preclusive effect of judgments, including the relitigation of claims and issues that were litigated, or might have been litigated, in a prior action.' "[17] On the other hand, the court has also used res judicata to mean claim preclusion only, saying, for example, that "[r]es judicata acts to prevent relitigation of claims that were or should have been decided among the parties in an earlier proceeding."[18] Here, where no one contends that the 1988 and 1989 settlement agreements were actually litigated in the earlier dissolution proceeding, we use res judicata to mean claim preclusion only.

When res judicata is used to mean claim preclusion, it encompasses the idea that when the parties to two succes-

---

[16]JACK H. FRIEDENTHAL ET AL., CIVIL PROCEDURE § 14.1, at 607 (1985).

[17]Loveridge v. Fred Meyer, Inc., 125 Wn.2d 759, 763, 887 P.2d 898 (1995) (quoting Trautman, 60 WASH. L. REV. at 805).

[18]Norris v. Norris, 95 Wn.2d 124, 130, 622 P.2d 816 (1980).

sive proceedings are the same,[19] and the prior proceeding culminated in a final judgment,[20] a matter may not be relitigated, or even litigated for the first time, if it could have been raised, and in the exercise of reasonable diligence should have been raised, in the prior proceeding. As already noted, the Supreme Court has said that "res judicata acts to prevent relitigation of claims that were *or should have been* decided among the parties in an earlier proceeding."[21] The Court has also said, on numerous occasions, that res judicata

applies, except in special cases, not only to points upon which the court was actually required by the parties to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of litigation, and which the parties, *exercising reasonable diligence*, might have brought forward at that time.[22]

And the Court has further said:

This court from early years has dismissed a subsequent ac-

---

[19]*Mellor v. Chamberlin*, 100 Wn.2d 643, 645, 673 P.2d 610 (1983).

[20]*Mellor*, 100 Wn.2d at 645.

[21]*Norris*, 95 Wn.2d at 130 (emphasis added).

[22]*Golden v. McGill*, 3 Wn.2d 708, 720, 102 P.2d 219 (1940) (emphasis added); *see also, e.g., Schoeman v. New York Life Ins. Co.*, 106 Wn.2d 855, 859, 726 P.2d 1 (1986); *Sanwick v. Puget Sound Title Ins. Co.*, 70 Wn.2d 438, 441-42, 423 P.2d 624 (1967); *Witte v. Old Nat'l Bank of Spokane*, 29 Wn.2d 704, 708-09, 189 P.2d 250 (1948); *Metropolitan Life Ins. Co. v. Davies*, 2 Wn.2d 155, 161, 97 P.2d 686 (1940); *Youngquist v. Thomas*, 196 Wash. 444, 455, 83 P.2d 337, 87 P.2d 1120 (1939); *Large v. Shively*, 194 Wash. 608, 627-28, 79 P.2d 317, 82 P.2d 793 (1938); *Baxter v. Central W. Cas. Co.*, 186 Wash. 459, 461, 58 P.2d 835 (1936); *Currier v. Perry*, 181 Wash. 565, 569, 44 P.2d 184 (1935); *Lea v. Young*, 168 Wash. 496, 504, 12 P.2d 601 (1932); *Cascade Lumber Co. v. Hargis*, 167 Wash. 409, 415, 9 P.2d 366 (1932); *Anderson v. National Bank*, 146 Wash. 520, 528, 264 P. 8 (1928); *Crandall v. Iten*, 128 Wash. 277, 284, 222 P. 894 (1924); *Woodland v. First Nat'l Bank*, 124 Wash. 360, 362, 214 P. 630 (1923); *Payette v. Ferrier*, 31 Wash. 43, 52, 71 P. 546 (1903); *Marble Sav. Bank v. Williams*, 23 Wash. 766, 777, 63 P. 511 (1901); *Sayward v. Thayer*, 9 Wash. 22, 24, 36 P. 966 (1894); *Wilkes v. Davies*, 8 Wash. 112, 121, 35 P. 611 (1894) (quoting *City of Aurora v. West*, 74 U.S. 82, 19 L.Ed. 42, 7 Wall. 82 (1868)); *Keiffer v. City of Seattle Civil Serv. Comm'n*, 87 Wn. App. 170, 940 P.2d 704 (1997); *Seattle-First Nat'l Bank v. Kawachi*, 19 Wn. App. 460, 462, 576 P.2d 68, *aff'd*, 91 Wn.2d 223 (1978); *Phillips v. Hardwick*, 29 Wn. App. 382, 386, 628 P.2d 506 (1981); *Meder v. CCME Corp.*, 7 Wn. App. 801, 804, 502 P.2d 1252 (1972).

tion on the basis that the relief sought *could have and should have been* determined in a prior action. The theory on which dismissal is granted is variously referred to as res judicata or splitting causes of action.[23]

After concluding that a matter could have and should have been litigated earlier, the Court has often implemented its conclusion by saying that all parts of a successful claim are merged in the final judgment;[24] that all parts of an unsuccessful claim are barred by the final judgment;[25] or that a party cannot "split" his or her claim, thus generating a multiplicity of actions.[26]

■ Although many tests have been suggested for determining whether a matter should have been litigated in a prior proceeding,[27] there is no simple or all-inclusive test.[28] Instead, it is necessary to consider a variety of factors,[29] including, according to the Supreme Court, whether the present and prior proceedings arise out of the same facts, whether they involve substantially the same evidence, and whether rights or interests established in the first proceeding would be destroyed or impaired by completing the second proceeding.[30] In general, one cannot say that a matter should have been litigated earlier if, for

---

[23]*Sanwick*, 70 Wn.2d at 441 (emphasis added); *see also Schoeman*, 106 Wn.2d at 859; *Fluke Capital & Management Servs. Co. v. Richmond*, 106 Wn.2d 614, 619-20, 724 P.2d 356 (1986); *Shively*, 194 Wash. at 627; *Hallgren Co. v. Correl, Inc.*, 13 Wn. App. 263, 267, 534 P.2d 591 (1975); *Meder*, 7 Wn. App. at 803.

[24]*E.g., Warren v. Rickles*, 129 Wash. 443, 446, 225 P. 422 (1924); Trautman, 60 WASH. L. REV. at 814.

[25]*E.g., Tacoma Mill Co. v. Northern Pac. Ry.*, 102 Wash. 95, 98, 172 P. 812 (1918); Trautman, 60 WASH. L. REV. at 814-15.

[26]*E.g., Loveridge*, 125 Wn.2d at 763; *Sanwick*, 70 Wn.2d at 441; *Currier*, 181 Wash. at 570; *Howell v. Hunters Exch. State Bank*, 149 Wash. 249, 251, 270 P. 831 (1928); Trautman, 60 WASH. L. REV. at 814.

[27]*Mellor*, 100 Wn.2d at 646.

[28]*Rains v. State*, 100 Wn.2d 660, 663-64, 674 P.2d 165 (1983); Trautman, 60 WASH. L. REV. at 815-16.

[29]See the cases collected and discussed in Trautman, 60 WASH. L. REV. at 814-18.

[30]*Rains*, 100 Wn.2d at 664.

some reason, it could not have been litigated earlier;[31] thus, res judicata will not operate if a necessary fact was not in existence at the time of the prior proceeding,[32] or if evidence needed to establish a necessary fact would not have been admissible in the prior proceeding.[33] Similarly, one cannot say that a matter should have been litigated earlier if, even though it could have been litigated earlier, there were valid reasons for not asserting it earlier; thus, res judicata may not operate if the matter was an independent claim not required to be joined,[34] or if the matter's omission from the prior proceeding actually benefitted, rather than vexed, the party now purporting to rely on res judicata.[35] Conversely, however, it has been held that a matter should have been raised and decided earlier if it is merely an alternate theory of recovery, or an alternate remedy.[36]

As three cases illustrate, these principles apply when, after a final probate decree has distributed a decedent's property, a party sues to obtain a larger share than he or she was awarded in the decree. In one case, *Norris v. Norris*,[37] a husband and wife owned a ranch as community property. The wife executed a will that left a life estate in the ranch to the husband, and the remainder interest in the ranch to a son and grandson. She also executed a community property agreement that left all community prop-

---

[31]*See Cummings v. Sherman*, 16 Wn.2d 88, 101, 132 P.2d 998 (1943).

[32]*Mellor*, 100 Wn.2d at 647; *Curtiss v. Crooks*, 190 Wash. 43, 53, 66 P.2d 1140 (1937); *Harsin v. Oman*, 68 Wash. 281, 283-84, 123 P.1 (1912).

[33]*Mellor*, 100 Wn.2d at 646; *Marquardt v. Federal Old Line Ins. Co.*, 33 Wn. App. 685, 689, 658 P.2d 20 (1983); *Meder*, 7 Wn. App. at 806; Trautman, 60 WASH. L. REV. at 816 n.78.

[34]*See* CR 18.

[35]*See Howell*, 149 Wash. at 251-52; *State ex rel. White Pine Sash Co. v. Superior Court*, 145 Wash. 576, 579-81, 261 P. 110 (1927), Trautman, 60 WASH. L. REV. at 827-28.

[36]*Bill v. Gattavara*, 34 Wn.2d 645, 649, 209 P.2d 457 (1949); *Sweeney v. Waterhouse & Co.*, 43 Wash. 613, 617, 86 P. 946 (1906); *Meder*, 7 Wn. App. at 810, Trautman, 60 WASH. L. REV. at 815.

[37]95 Wn.2d 124.

erty, including the entire ranch, to the husband. When the wife died, the husband did not assert the community property agreement in the probate proceedings, even though he was acting as her personal representative. Thus, the probate court issued a final decree distributing the ranch in accordance with the will, and the husband took only a life estate. Later, the husband filed a new action alleging, on the basis of the community property agreement, that he was entitled not just to a life estate, but to the entire ranch. Holding that the new action should be dismissed, the Supreme Court said:

> Res judicata acts to prevent relitigation of claims that were or should have been decided among the parties in an earlier proceeding. In this case, because the applicability of the community property agreement could and should have been determined in the probate of [the wife's] estate, res judicata prevents the court from now reexamining the distribution in light of the community property agreement. . . . [38]

In a second case, *Golden v. McGill*,[39] a probate court issued a final decree that distributed a father's estate in part to his daughter and in part to other legatees. Later, the daughter filed a new action in which she sought to obtain a greater share of the property. As a basis for the new action, she alleged, presumably for the first time, that her father and mother had entered into an oral contract of which she, the plaintiff, was a third-party beneficiary, and that this contract gave her more than the decree had. Holding that the new action should be dismissed, the Supreme Court said:

> The decree of distribution, which was entered after hearing, . . . constitutes a binding adjudication of the rights of appellant, who appeared generally and acquiesced in everything that was done and that could have been done. . . . That is, the decree of distribution became *res adjudicata* of the issues

---

[38]*Norris*, 95 Wn.2d at 130-31.

[39]3 Wn.2d 708.

here presented, as the matter in controversy in the case at bar was or could have been adjudicated in that hearing.[40]

In a third case, *In re Estate of Ostlund,*[41] the question was whether children not mentioned in their mother's will could claim a share of the mother's property after a final probate decree had distributed all her property to the father. Answering in the negative, the Supreme Court stated that once a final decree is entered, it " 'becomes the measure of the rights of all claimants to the estate, and their rights are to be determined by the terms of this decree.' "[42]

■ In our view, these cases apply not only when a final probate decree has distributed property belonging to a decedent, but also when a final dissolution decree has distributed property belonging to a married couple. In the dissolution situation no less than in the probate one, a party who claims a share of the property being distributed can, and in the exercise of reasonable diligence should, bring to the attention of the court any previous agreement that allegedly affects the distribution. At least generally, then,[43] a predissolution separation agreement merges into the final dissolution decree, and it may not later be used as a basis for altering the decree's distribution of the parties' property (except, of course, to the extent that the decree sets it forth or incorporates it by reference).

Parenthetically, this result is consistent with RCW 26.09.070(5), which provides in pertinent part that "[u]nless the separation contract provides to the contrary, the

---

[40]*Golden*, 3 Wn.2d at 715.

[41]57 Wash. 359, 106 P. 1116 (1910).

[42]57 Wash. at 365 (quoting *Cunha v. Hughes*, 122 Cal. 111, 112, 54 P. 535 (1898)).

[43]We do not foreclose the possibility that in an unusual case, there might be extraordinary circumstances that would justify not bringing a previous property-distribution agreement to the attention of the dissolution court. This, however, is not that case.

agreement shall be set forth in the decree of dissolution . . . , or filed in the action or made an exhibit and incorporated by reference." We have no occasion to consider the meaning of the phrase, "unless the separation contract provides to the contrary," and we do not hold that res judicata would, or would not, block the post-decree enforcement of a contract containing such a provision.

Moreover, our result does not foreclose a party from claiming and proving that a final decree was mutually intended to reflect the terms of a separation agreement, but failed to do so due to scrivener's error.[44] Here, we have no such claim and no such proof.

Turning to this case, it is obvious that Kelly could have, and in the exercise of reasonable diligence should have, brought the 1988 separation agreement to the attention of the court. It is equally obvious that Hansen could have, and in the exercise of reasonable diligence should have, brought the 1989 separation agreement to the attention of the court. Each agreement allegedly dealt with the division of the parties' property, and that was the very subject before the court. Moreover, if either agreement is enforced now, it will impair, if not destroy, the property distribution terms set forth in the final decree. Assuming without holding that each agreement was otherwise enforceable, we conclude that it merged in the final decree, and that it cannot now be relied on as a basis for altering the distribution of property made by that decree.

Having eliminated the alleged separation agreements, we can easily resolve the rest of the problem. The decree was entered on May 24, 1989. At that time, according to the decree's express provisions, Hansen owed Kelly a debt of $8,000, with interest at 12 percent per year, secured by the lien he now seeks to cancel. He thereafter paid $4,500, leaving $3,500, plus interest, unpaid. Kelly was required to credit the $4,500 against the $8,000 debt, for no other

---

[44]*See* CR 60(a).

debt was created by or preserved in the decree. We conclude that Hansen continues to owe $3,500, plus interest at 12 percent, and that the trial court erred when it cancelled Kelly's lien.

## II

██ Two minor issues remain. At the summary judgment hearing on April 14, Kelly's attorney moved for a continuance, and for leave to amend her pleadings to state a claim for fraud. As grounds for a continuance, she explained that she had not been retained until March 8, that Kelly had been out of town on a two-week business trip, that Kelly had had a death in the family, and that she, the attorney, had taken Hansen's deposition only 10 days ago. As grounds for leave to amend, she explained that she had had the Kingston property appraised five days ago, and that the appraiser's report had given her grounds to believe, for the first time, that Hansen had fraudulently misrepresented the value of the property in January 1989. The trial court denied both motions, but said it was denying the motion to amend without prejudice to Kelly's right to file, in the original dissolution action, a CR 60 motion for relief from judgment. Although Kelly now assigns error to both rulings, we think that both were discretionary,[45] and that neither was an abuse of discretion. Thus, we conclude that the trial court did not err in ruling as it did.

Reversed and remanded for further proceedings consistent herewith. Neither side shall receive reasonable attorney's fees or costs on appeal.

HOUGHTON, C.J., and ARMSTRONG, J., concur.

Reconsideration denied September 19, 1997.

---

[45]*Heron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 165, 736 P.2d 249 (1987); *Del Guzzi Constr. Co. v. Global N.W., Ltd.*, 105 Wn.2d 878, 888, 719 P.2d 120 (1986); *Quackenbush v. State*, 72 Wn.2d. 670, 672, 434 P.2d 736 (1967); *Tucker v. Tucker*, 14 Wn. App. 454, 455, 542 P.2d 789 (1975).